**FORD MOTOR COMPANY, et al.**

v.

**INSURANCE COMMISSIONER OF the COMMONWEALTH OF PENNSYLVANIA.**

Civ. A. No. 87–3241.

United States District Court,
E.D. Pennsylvania.

Oct. 26, 1987.

Harvey Bartle, III, Philadelphia, Pa., for plaintiff.

Jean M. Callihan, Asst. Counsel, Pennsylvania Ins. Dept., Harrisburg, Pa., for defendant.

William R. Balaban, Harrisburg, Pa., for intervenors.

## MEMORANDUM AND ORDER

ROBERT F. KELLY, District Judge.

In this case, the plaintiff, Ford Motor Company and its subsidiaries, Ford Motor Credit Company, The American Road Insurance Company, Ford Life Insurance Company, First Nationwide Financial Corporation and First Nationwide Bank, have brought this action against the Insurance Commissioner of the Commonwealth of Pennsylvania seeking declaratory and injunctive relief against enforcement of Section 641 of the Insurance Department Act, 40 P.S. § 281. By order of October 9, 1987, the Pennsylvania Association of Independent Insurance Agents, John M. Ulrich, Jr., the Professional Insurance Agents Association of Pennsylvania, Maryland and Delaware, Inc., Charles P. Leach, Jr., the Pennsylvania Association of Life Underwriters and Harold E. Alexander were permitted to intervene, maintaining that Section 641 is constitutional. Hereinafter, these intervenors will be referred to as the Insurance Agents.

Section 641 provides, in pertinent part that, "No lending institution, ... savings and loan holding company or any subsidiary or affiliate of the forgoing ... may, directly or indirectly, be licensed or admitted as an insurer" except that lending institutions are permitted to sell credit life, health and accident insurance and to underwrite and sell title insurance. Ford Motor Company's subsidiaries, The American Road Insurance Company and Ford Life, are and have been for many years selling insurance in Pennsylvania.

Ford Motor Company's subsidiary, First Nationwide Financial Corporation, owns the First Nationwide Bank (FNB) a federally chartered savings bank. Federal law treats a federally chartered savings bank as a federal savings and loan association for all purposes. 12 U.S.C. § 1464(d).

State Savings Company of South Euclid, Ohio and Citizens Home Savings Company of Lorrain, Ohio, two failing Ohio state chartered savings and loan associations insured by the Federal Savings and Loan Insurance Corporation (FSLIC), were placed by the Federal Home Loan Bank Board into the receivership of the FSLIC. The Bank Board appointed the FSLIC as

receiver of these savings and loans with authority to liquidate or make such other disposition as the FSLIC found to be in the best interests of the savings and loans, their depositor‚ and the FSLIC.

In June 1986, acting under authority of the 12 U.S.C. § 1730a(m), the Bank Board authorized the merger of the Ohio savings and loans with FNB, making the following findings, referring to the Ohio savings and loans as the Associations and FNB as FNS, for First Nationwide Savings, the previous name of FNB.

RESOLVED FURTHER, That the Bank Board, as operating head of the FSLIC, hereby determines with respect to the Acquisition and Merger that:

1. Severe financial conditions exist which threaten the stability of a significant number of institutions, the accounts of which are insured by the FSLIC ("insured institutions"), and of insured institutions possessing significant financial resources;

2. Each of the Associations is a failing institution that is eligible for assistance pursuant to § 406(f) of the NHA, 12 U.S.C. § 1729(f) (1982);

3. The procedures used by agents of the FSLIC to solicit practicable offers from prospective purchasers or merger partners both qualified and capable of acquiring the assets and liabilities of each of the Associations comply with the standards of § 408(m) of the NHA, 12 U.S.C. § 1730a(m) (1982);

4. The Bank Board, in making the findings and issuing the approvals contained in this Resolution, has given full and due consideration to the need to minimize the cost of financial assistance, the maintenance of specialized depository institutions, and the priorities and purposes of § 408(m) of the NHA, 12 U.S.C. § 1730a(m) (1982);

5. The Acquisition and Merger would lessen the risk to the FSLIC;

6. No other offer was made to acquire both of the Associations;

7. No offeror both qualified and capable of acquiring substantially all of the assets and liabilities of either of the Associations made an offer to acquire either of the Associations in a form and with conditions acceptable to the FSLIC the estimated cost of which was within the lesser of 15 percent or $15 million of the cost of the offer of FNS to acquire both Associations;

8. The offer of FNA to acquire both Associations presents the lowest expanse and least risk to the FSLIC of any proposal submitted for either of the Associations;

9. The offer of FNS is substantially less costly to the FSLIC than any alternative proposal or proposals.

Merging with these Ohio savings and loan associations and assuming their liabilities would not have been a sound business proposition for FNB or any other company unless it were offered some inducement to do so. If the FSLIC were to have offered money to induce a merger with the Ohio savings and loan associations, it would have cost the FSLIC a substantial amount. Instead, under authority of 12 U.S.C. § 1730a(m), the Bank Board granted to FNB the right to open branches in Pennsylvania and Colorado. The Bank Board made the following finding:

The Bank Board finds that the Acquisition and Merger are of very substantial benefit to the FSLIC in a measure sufficient to constitute a compelling factor in determining to make an award of branching rights in Pennsylvania and Colorado to FNS.

FNB would not have acquired the Ohio savings and loan associations if it did not get the right to open branches in these two states in return.

In February 1987, FNB filed an application with the Bank Board for permission to open the Pennsylvania branch office. In April 1987, the Bank Board approved the application and the branch opened on May 20, 1987. Plaintiffs were then apparently in violation of Section 641 of the Pennsylvania Insurance Department Act which forbids companies with savings and loan affiliates from selling insurance.

On June 1, 1987, the plaintiffs filed suit in this court seeking declaratory and in-

junctive relief to prevent Section 641 from being enforced against them. On July 7, 1987, the plaintiffs filed a motion for summary judgment arguing that Section 641 was unconstitutional as a violation of equal protection and because federal law preempted state law in this area and requesting a declaratory judgment and injunctive relief. On August 5, 1987, the defendant answered this motion and the plaintiffs filed a reply brief on August 26.

On August 5, 1987, the Insurance Agent intervenors filed their motion to intervene and appended thereto a motion to dismiss the complaint on abstention grounds. The Insurance Agents' motion to intervene was granted on October 8, 1987.

On September 4, 1987, the defendant filed a motion to dismiss on abstention grounds, relying on the motion of the intervenors.

On June 29, 1987, the intervenors filed a complaint with the Insurance Commissioner seeking administrative action against the plaintiffs in this case to revoke their insurance licenses. On July 27, 1987, the Insurance Commissioner ordered Ford to file an answer to this complaint. On August 31, 1987, a presiding officer was appointed to hear this complaint and the complaint was officially docketed by the Insurance Commissioner. Subsequently, the plaintiffs filed in this court a motion for a preliminary injunction to prevent the holding of an administrative hearing or any other action in the administrative proceeding before the Insurance Commissioner.

For the reasons stated below, the plaintiffs' motion for summary judgment was granted and the motions to dismiss on abstention grounds were denied. This decision makes the plaintiffs' motion for preliminary injunction moot.

Plaintiffs advanced three reasons in support of their motion for summary judgment: 1) that Section 641 was unconstitutional as a violation of equal protection, 2) that Section 641 was unconstitutional because Congress has preempted all state regulation of the savings and loan industry, and 3) 12 U.S.C. § 1730a(m) preempts state attempts to regulate the activities of companies that buy failing savings and loans pursuant to its provisions allowing emergency acquisitions.

■ The basis for the plaintiffs' argument that Section 641 is a violation of equal protection is that Section 641 allows lending institutions to sell credit life, health and accident insurance, and title insurance, but not other kinds of insurance. The plaintiffs argue that if there is any danger that a lending institution will overreach and improperly push insurance to its customers, this danger is in the area of credit insurance. By omitting credit insurance from its provisions, but forbidding the sale of other insurance, Pennsylvania was making a distinction with no rational basis, plaintiffs assert, permitting the sale of insurance where there is serious danger of abuse but forbidding it where there is little or none.

The plaintiffs cite *ADA Financial Service Corp. v. New Jersey*, 174 N.J. Super. 337, 416 A.2d 908 (1979) a decision of the Appellate Division of the New Jersey Superior Court which did hold a New Jersey statute very similar to Section 641 unconstitutional as a violation of equal protection.

However, consideration of Supreme Court opinions on the correct equal protection analysis to use in the area of economic regulation leads to the opposite conclusion.

In *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) the Supreme Court stated:

When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their

local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. Legislatures may implement their program step by step in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations. In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment.

*Id.* at 303–04, 96 S.Ct. at 2516–17 (citations omitted).

In *Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955) the Supreme Court upheld an Oklahoma statute that prohibited any optician from fitting any person with glasses without a prescription from an ophthalmologist or an optomitrist, even to the extent of prohibiting taking lenses from an old pair of glasses and putting them in new frames without a prescription. At the same time, the statute specifically allowed the selling of ready to wear correcting glasses by anyone. In that case, the Court stated:

[T]he District Court held that it violated the Equal Protection Clause of the Fourteenth Amendment to subject opticians to this regulatory system and to exempt, as § 3 of the Act does, all sellers of ready-to-wear glasses. The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no fur-

ther than the invidious discrimination. We cannot say that that point has been reached here.

*Id.* at 488–89, 75 S.Ct. at 465 (citations omitted).

In short, Section 641 is just the sort of classification that state legislatures are permitted to make, indeed, must make if they are going to engage in meaningful economic regulation. See, Nowak, Rotunda and Young, *Treatise on Constitutional Law, Substance and Procedure*, §§ 18.2, 18.42.

Plaintiffs also claim that Section 641 is unconstitutional because the Congress has preempted this area of regulation and that therefore state regulation is invalid. The Supreme Court in *California Federal Savings and Loan Association v. Guerra*, ―― U.S. ――, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) has stated the following regarding whether an area of law has been preempted by the federal government.

In determining whether a state statute is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress. Federal law may supersede state law in several different ways. First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation....

As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

—— U.S. at ——, 107 S.Ct. at 689 (citations omitted). The plaintiffs allege that regulations like Section 641 have been preempted by Congress by both the second and third alternatives that the court discusses.

It should be noted that no party contends that Congress does not have the power to preempt state law in this area, the only question for consideration here is whether or not Congress has exercised that power.

■ The plaintiffs cite a number of cases which state that the Congress has granted the FSLIC and the Bank Board such broad authority that there is no room for any state regulation of the operations of savings and loan associations. *Fidelity Federal Savings and Loan Association v. de la Cuesta*, 458 U.S. 141, 161, 102 S.Ct. 3014, 3026, 73 L.Ed.2d 664 (1982); *Conference of Federal Savings and Loan Associations v. Stein*, 604 F.2d 1256, 1260 (9th Cir.), *aff'd mem*, 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed. 2d 754 (1979). There is a vast and complete set of federal regulations of the savings and loan industry, see 12 U.S.C., 12 C.F.R. Chapter V, and certainly the federal government has preempted the field of regulating the internal operations of savings and loan associations.

However, Pennsylvania contends that it is not regulating the operations of savings and loan associations, merely regulating what affiliates insurance companies may have, and regulating insurance companies is a field traditionally left to state regulation. Pennsylvania contends that although the federal government has preempted regulation of internal operations of savings and loan associations, it has not claimed to do any more than that.

The regulations issued by the Bank Board do make provision for state law preventing savings and loan associations from engaging in the insurance business. 12 C.F.R. § 555.17 states that referral of the insurance business of depositors to an insurance agency owned by an officer or director is a usurpation of a corporate opportunity, unless "a specific State statute or regulation precluded Federal association service corporations (or their wholly-owned subsidiaries) from engaging in the insurance business."

When deciding whether federal regulation precludes state regulation, the Supreme Court has held that where both state and federal statutory schemes may co-exist, preemption is not implied. *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). In *Merrill Lynch v. Ware,* 414 U.S. 117, 127, 94 S.Ct. 383, 389, 38 L.Ed.2d 348 (1973), the Court stated "the proper approach is to reconcile 'the operation of both statutory schemes with one another rather than holding one completely ousted.'" quoting *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

Clearly, if Pennsylvania tried to issue regulations on the internal operations of savings and loan associations, it would be preempted by a body of federal law so complete that it would inevitably conflict, however, the regulation in question does not interfere with the federal government's control of savings and loan operations. Further, in one area were state law might conceivably interfere with federal policy, 12 C.F.R. § 555.17 specifically accomodates the state interest. For these reasons it is held that Section 641 is not unconstitutional because the federal government has preempted any state regulations touching on the business of savings and loan associations.

■ The plaintiffs also contend that Section 641 is preempted as it applies to them by 12 U.S.C. § 1730a(m) which authorizes the FSLIC to arrange the acquisition of failing savings and loan associations on an emergency basis, and this court does hold that this contention of the plaintiff is correct.

12 U.S.C. § 1730a(m) authorizes the FSLIC to arrange the acquisition of failing savings and loan associations and regulates this process. 12 U.S.C. § 1730a(m) states in pertinent part: "Notwithstanding any provision of the laws or constitution of any State or any provision of Federal law ... the Corporation, upon its determination that severe financial conditions exist which

threaten the stability of a significant number of insured institutions ... may authorize any company to acquire control of said insured institution."

The question for decision here is: what did the Congress mean by the words "any company"? Did it mean any company not in the insurance business or willing to give up insurance affiliates? Or, did it mean any company without regard to what business it is in or any activities restrictions that state law may place on banks, savings and loans or insurance companies?

When deciding whether or not a federal statute was intended to preempt state law, the United States Supreme Court routinely relies on the statute's legislative history. See, for example, *Metropolitan Life Insurance Co. v. Taylor*, — U.S. —, —, 107 S.Ct. 1542, 1547, 95 L.Ed.2d 55 (1987); *California Coastal Comm'n. v. Granite Rock Co.*, — U.S. —, —, 107 S.Ct. 1419, 1431, 94 L.Ed.2d 577 (1987); *California Federal Savings & Loan Association v. Guerra*, — U.S. —, —, 107 S.Ct. 683, 690, 93 L.Ed.2d 613 (1987); *R.J. Reynold's Tobacco Co. v. Durham County*, — U.S. —, —, 107 S.Ct. 499, 509–10, 93 L.Ed. 2d 449 (1986); *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 237–38, 105 S.Ct. 1245, 1253, 84 L.Ed.2d 169 (1985).

The Senate Committee on Banking, Housing and Urban Affairs report on the Garn–St. Germain Depository Institutions Act of 1982 by which 12 U.S.C. § 1730a(m) was enacted stated that one purpose of the act was to provide flexibility to the FSLIC "to deal with financially distressed depository institutions." S.Rep. No. 536, 97th Cong., 2d Sess. 1 *reprinted in* 1982 U.S. Code Cong. & Admin.News 3054, 3055.

Regarding the economic background and the financial condition of the FSLIC that made § 1730a(m) necessary, the report stated:

> The FSLIC has processed a wave of merger applications from savings and loan associations attempting to strengthen their operations and improve operational efficiencies, as well as an increasing number of applications regarding distressed savings and loan associations, during the part year and a half. In 1981, 328 savings and loans disappeared as a result of voluntary merger transactions and, from January through July 20 of this year, another 281 savings and loans were voluntarily merged out of existence.
>
> Since 1981, when savings and loan associations had an aggregate net worth of $32.2 billion, their earnings decline and losses resulted in an industry net worth of $24.7 billion as of June 30, 1982. As of that date, there were 1,055 savings and loan associations (with $270 billion in assets) with net worth of 3 percent or less, and 223 of those associations (with $40 billion in assets) had net worth of less than 1 percent. Using an interest rate scenario based on a Treasury bill rate of 9½ percent, the FHLBB has projected that there will be 1,110 associations with 3 percent or less net worth by the end of 1982, with 264 of those associations with 1 percent or less net worth. Using a 13½ percent Treasury bill rate scenario, there will be 1,511 associations with 3 percent or less net worth by the end of this year, with 471 of those associations with 1 percent or less net worth.

.    .    .    .    .

> The problems of mutual savings banks and savings and loan associations have largely resulted from an economic environment characterized by high and volatile interest rates, in which the cost of funds has increased rapidly, while slow repayment of old mortgages has led to an extremely sluggish increase in gross asset yields. Thrifts had been accustomed to a relatively stable economic environment in which a positive yield curve was the norm, and they had been able to remain profitable by borrowing short and lending long. However, over the last several years thrift institutions have been the victims of fluctuating interest rates and a negative yield curve. As such institutions' profits have turned to losses and their net worths have declined, the FDIC and FSLIC have developed programs to deal with problem and failing institutions.

The principal purpose of this article is to provide the agencies with better tools for dealing with failing institutions and to facilitate and expand upon such programs so as to strengthen the resources of the Federal insurance funds.

*Id.* at 4, 5, 1982 U.S.Code Cong. & Admin. News at 3057–58, 3059.

Regarding § 1730a(m) itself, the report stated:

This section allows the FSLIC, regardless of any other law (except antitrust law) to authorize an insured institution eligible for FSLIC assistance to merge with any other insured institution or an FDIC-insured bank, or to be acquired by any holding company. This would enable the FSLIC to arrange mergers of institutions across State lines notwithstanding interstate branching prohibitions, and to let holding companies acquire institutions other than in their home State, and *without regard to normal activities restrictions.*

*Id.* at 49, 1982 U.S.Code Cong. & Admin. News at 3103 (emphasis added).

Section 1730a(m) was reenacted in 1987 as part of the Competitive Equality Banking Act of 1987. Section 1730a(m) had lapsed on October 13, 1986 and was reenacted by this Act retroactively on August 10, 1987. The Conference Report on this act states that § 1730a(m)

preempts other provisions of Federal and State law that would have the effect of preventing a company from acquiring a failing thrift institution. Thus, for example, if a life insurance company invested in or acquired a thrift institution under [§ 1730a(m) ], that section would preempt any State law that would prevent the company from continuing to engage in the life insurance business because of that investment or acquisition.

H.R.Rep. No. 261, 100th Cong., 1st Sess., Cong. Rec. H6857, H6895 (daily ed. July 31, 1987).

Since a conference report represents the final statement of terms agreed to by both houses of Congress, next to the statute itself, it is the most persuasive evidence of congressional intent. *Davis v. Lukhard,*

788 F.2d 973, 981 (4th Cir.1986); *Demby v. Schweiker,* 671 F.2d 507, 510 (D.C.Cir. 1981). Clearly, it was the intent of Congress that the FSLIC have the largest possible selection of companies available to acquire failing savings and loan associations. This was to include companies that had insurance businesses that they would be unwilling to give up, in order to allow the FSLIC to dispose of failing associations at the least cost and therefore protect its reserves. Congress clearly believes that laws like Section 641 are "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

Thus, it is clear that Congress has the power to preempt Section 641 and that, as to emergency acquisitions of failing savings and loans, Congress has exercised that power. For this reason the plaintiffs are entitled to the declaratory judgment demanded by their motion for summary judgment.

■ The other issue before the court for disposition is the question of whether the court should abstain from exercising its jurisdiction in this case.

The intervenor Insurance Agents and defendant Insurance Commissioner contend that the court should refrain from exercising jurisdiction in this case under the law of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and the cases following it. These cases hold that a federal court should decline to interfere with a pending state proceeding for reasons of comity and federalism if important state interests are involved. Many of these cases refer to this concept as the doctrine of "Our Federalism." See Wright, Miller and Cooper, *Federal Practice and Procedure,* §§ 4251 to 4255.

Some of the important state interests that the Supreme Court has held justify *Younger* abstention are: the state's interest in enforcing its criminal laws, *Younger, supra* at 46, 91 S.Ct. at 751, the state's interest in enforcing the judgments and orders of its courts, *Pennzoil v. Texaco,* —— U.S. ——, ——, 107 S.Ct. 1519, 1527, 95 L.Ed.2d 1 (1987), the state's interest in

eliminating sex discrimination, *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619, ——, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1987). Enforcing the state's insurance laws would seem to be an important state interest under the *Younger* doctrine.

In this case, the complaint in the federal action was filed almost a month before the first filing in the state administrative action. However, that is not necessarily dispositive of the abstention motion. In *Hicks v. Miranda*, 422 U.S. 332, 349, 95 S.Ct. 2281, 2291, 45 L.Ed.2d 223 (1975), the Supreme Court held that, if the state proceedings have begun "after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the principles of *Younger v. Harris* should apply in full force." Because of the decision in this case, it is unnecessary to decide when the state action in this case was actually begun or when "proceedings of substance on the merits" began in this case.

What is dispositive here is a line of cases from the Courts of Appeals for the Third, Eighth, Ninth and Eleventh Circuits that hold that there can be no important state interest that the federal court should defer to in enforcing a state law that has been preempted by federal law.

In *Kentucky West Virginia Gas Company v. Pennsylvania Public Utility Commission*, 791 F.2d 1111 (3rd Cir.1986) the Gas Company requested permission of the P.U.C. to raise its rates because of an increase in the cost of buying gas from interstate pipelines. The P.U.C. denied this request because it held that the Gas Company was not following a least cost fuel procurement policy in buying gas from pipelines. The Gas Company pursued two avenues of relief from the P.U.C.'s order. It appealed to the Commonwealth Court under authority of Pennsylvania administrative law and it filed suit in federal district court alleging that Pennsylvania's least cost fuel procurement policy was preempted by the Natural Gas Act and the Natural Gas Policy Act or that it violates the commerce and equal protection clauses of the Constitution. Under these circumstances, the District Court held that it should abstain under *Younger* and leave the federal plaintiff with the action it had started in the Pennsylvania Commonwealth Court.

The Court of Appeals reversed stating that, although the District Court was correct in concluding that Pennsylvania has an important state interest in regulating retail natural gas rates, there is an equally important federal interest in regulating interstate natural gas rates and that Congress has given exclusive authority in this area to the Federal Energy Regulatory Commission which had approved the Gas Company's policy of buying gas from interstate pipelines. The Court of Appeals held that, because this area had been preempted from state regulation, there was no important state interest to defer to here. *Id.* at 1116. The Court of Appeals cited three decisions from other circuits in support of this conclusion: *Champion International Corporation v. Brown*, 731 F.2d 1406, 1409 (9th Cir.1984) ("Montana has no cognizable state interest in enforcing those age discrimination laws that are preempted by federal law."); *Middle South Energy, Inc. v. Arkansas Public Service Commission*, 772 F.2d 404, 417 (8th Cir.1985) (Comity "is not strained when a federal court cuts off state proceedings that entrench upon the federal domain."); *Baggett v. Department of Professional Regulation*, 717 F.2d 521, 524 (11th Cir.1983) ("When preemption is readily apparent, however, and, because of preemption, the state tribunal is acting beyond the lawful limits of its authority, abstention can serve no principle of comity or of 'our federalism.' ")

For these reasons the plaintiffs' motion for summary judgment is granted, the defendant's and intervenors' motions to dismiss on abstention grounds are denied and the plaintiffs' motion for a preliminary injunction is denied as moot.