FORD MOTOR COMPANY and Ford Motor Credit Company, and the American Road Insurance Company and Ford Life Insurance Company, and First Nationwide Financial Corporation and First Nationwide Bank

v.

INSURANCE COMMISSIONER OF the COMMONWEALTH OF PENNSYLVANIA.

Appeal of PENNSYLVANIA ASSOCIATION OF INDEPENDENT INSURANCE AGENTS, Ulrich, John M., Jr., Professional Insurance Agents Association of Pennsylvania, Maryland and Delaware, Inc., Leach, Charles P., Jr., Pennsylvania Association of Life Underwriters and Alexander, Harold E., (Intervening Defendants) in 88–1339.

UNITED SERVICES AUTOMOBILE ASSOCIATION, a Texas Reciprocal Interinsurance Exchange, USAA Casualty Insurance Company, a Texas Stock Insurance Company, USAA Life Insurance Company, a Texas Stock Insurance Company, and USAA Annuity and Life Insurance Company, a Texas Stock Insurance,

v.

MUIR, William J., III, Acting Insurance Commissioner of the Commonwealth of Pennsylvania.

Appeal of PENNSYLVANIA ASSOCIATION OF INDEPENDENT INSURANCE AGENTS, John Ulrich, Jr., Professional Insurance Agents Association of Pennsylvania, Maryland and Delaware, Inc.; Charles P. Leach, Jr.,; Pennsylvania Association of Life Underwriters; and Harold E. Alexander, in 88–5077.

UNITED SERVICES AUTOMOBILE ASSOCIATION, a Texas Reciprocal Interinsurance Exchange, USAA Casualty Insurance Company, a Texas Stock Insurance Company, USAA Life Insurance Company, a Texas Stock Insurance Company, and USAA Annuity and Life Insurance Company, a Texas Stock Insurance,

v.

MUIR, William J., III, Acting Insurance Commissioner of the Commonwealth of Pennsylvania,

Pennsylvania Association of Independent Insurance Agents, John Ulrich, Jr., Professional Insurance Agents Association of Pennsylvania, Maryland and Delaware, Inc.; Charles P. Leach, Jr.,; Pennsylvania Association of Life Underwriters; and Harold E. Alexander, Intervenors.

Appeal of Constance FOSTER, in 88–5078.

UNITED SERVICES AUTOMOBILE ASSOCIATION, a Texas Reciprocal Interinsurance Exchange, USAA Casualty Insurance Company, a Texas Stock Insurance Company, USAA Life Insurance Company, a Texas Stock Insurance Company, and USAA Annuity and Life Insurance Company, a Texas Stock Insurance,

v.

MUIR, William J., III, Acting Insurance Commissioner of the Commonwealth of Pennsylvania,

Pennsylvania Association of Independent Insurance Agents, John Ulrich, Jr., Professional Insurance Agents Association of Pennsylvania, Maryland and Delaware, Inc.; Charles P. Leach, Jr.; Pennsylvania Association of Life Underwriters; and Harold E. Alexander, Plaintiffs/Intervenors.

Appeal of UNITED SERVICES AUTOMOBILE ASSOCIATION, USAA Casualty Insurance Company, USAA Life Insurance Company, and USAA Annuity and Life Insurance Company, in 88–5121.

Nos. 88–1339, 88–5077, 88–5078 and 88–5121.

United States Court of Appeals, Third Circuit.

Argued Oct. 5, 1988.

Decided May 5, 1989.

Rehearing and Rehearing In Banc in Nos. 88–5077, 88–5078 and 88–5121 Denied June 9, 1989.

William R. Balaban, Balaban & Balaban, Harrisburg, Pa., Jonathan B. Sallet (argued), Miller, Cassidy, Larroca & Lewin, Washington, D.C., for appellants PA Assoc. of Ind. Ins. Agents in 88–1339 and 88–5077, and for appellees, PA Assoc. of Ind. Ins. Agents in 88–5121 and 88–5078.

Harvey Bartle, III (argued), Dechert, Price & Rhoads, Philadelphia, Pa., for appellee Ford in 88–1339.

John B. Knorr, III (argued), Chief Deputy Atty. Gen., Office of Atty. Gen., Harrisburg, Pa., for appellee, Constance Foster in 88–5121, 88–5077 and 88–5078.

Christopher K. Walters (argued), Reed, Smith, Shaw & McClay, Philadelphia, Pa., Robert B. Hoffman, Reed, Smith, Shaw & McClay, Harrisburg, Pa., for appellant United Services Auto. Ass'n, in 88–5121, 88–5077 and 88–5078.

Before HIGGINBOTHAM, MANSMANN and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, JR., Circuit Judge.

On these appeals we are revisited by significant questions concerning the appropriate applications of the doctrines of abstention and preemption, and of the dormant commerce clause of the United States Constitution. Although all such cases present issues that require delicate balancing, these cases are particularly sensitive because they concern both a federal scheme designed to assist the nation's failing savings and loans companies and the important state interest in regulating the state insurance industry. Upon our review of the contentions raised on these appeals, we conclude: (1) that the principles of *Younger* do not require abstention in these cases; (2) that Pennsylvania's statute that precludes companies that sell insurance in Pennsylvania from affiliation with savings and loan institutions is preempted to the extent that the state statute is applicable to companies authorized pursuant to federal legislation to purchase failing thrifts and (3) the state statute is not preempted in its application to other than failing thrifts and, in that application, does not violate the

Commerce Clause. In our view, that statute neither discriminates impermissibly in favor of in-state residents, nor presents a burden on interstate commerce and, it therefore, does not present harm precluded by the Commerce Clause. Accordingly, we will affirm the decisions of the district courts in these cases in part and reverse in part.

## I. *Background*

These appeals are taken from the judgments of district courts in two declaratory actions that were filed to determine the constitutionality of § 641 of the Insurance Department Act of 1921, as amended, P.L. 1148 (1987), *codified at* 40 Pa.Stat.Ann. (Purdon 1987 Supp.).[1] Although the cases are wholly separate and were filed independently, they were consolidated for the purposes of appeal because of the commonality of the underlying facts and the significant identity of the issues presented for review. The facts of neither case are in dispute. For the purposes of this discussion, we review the facts and procedural histories of each case briefly:

A. Pennsylvania Ass'n of Independent Insurance Agents v. Ford Motor Co. ("Ford")

In December 1985, Ford Motor Company ("Ford") acquired the First Nationwide Financial Corporation ("FNFC") which is a California based savings and loan holding company. Ford also acquired FNFC's subsidiary, First Nationwide Savings which Ford renamed First Nationwide Bank ("FNB"). At that time, FNB had offices located in California, New York, Florida and Hawaii.

In June 1986 Ford, through its new subsidiaries FNFC and FNB, arranged to purchase two Ohio based savings and loan companies, ("S & L's") that were failing and had been placed into receivership with the Federal Savings and Loan Insurance Corporation ("FSLIC"). FSLIC had solicited applications for the purchase of these S & L's pursuant to federal statutory guidelines designed to limit liability exposure for these failed companies which were federally insured. *See* 12 U.S.C. § 1730a (1982).[2] The failing Ohio S & L's were merged with FNB to create a larger national savings and loan entity. Subsequently, in February 1987, Ford requested and was granted permission by the Federal Home Loan Bank Board to open two additional branches of the newly constituted FNB. One of these new branches was in Pennsylvania.

Among the numerous subsidiary companies that are owned and controlled by Ford

---

**1.** In pertinent part, § 641 provides that

[n]o lending institution, ... bank holding company, savings and loan company or any subsidiary or affiliate of the foregoing, or officer or employee thereof, may directly or indirectly, be licensed or admitted as an insurer ... in this State

40 Pa.Stat.Ann. § 281(b)(Purdon 1987 Supp.). Such institutions may be licensed to "sell credit life, health and accident insurance and to sell and underwrite title insurance in accordance with regulations promulgated by the Insurance Commissioner." *Id.*

**2.** That statute provides for the "[r]egulation of holding companies." In its several sections, it provides explicit guidelines for, *inter alia*, the "registration and examination" of holding companies, *see* § 1730a(b); regulations of "[h]olding company activities," *see* § 1730a(c); "transactions," *see* § 1730a(d) and "acquisitions," *see* § 1730a(e)(1). Significant to the present cases, that statute also provides for "[e]mergency thrift acquisitions." *See* § 1730a(m). In pertinent part, that section provides that:

[n]otwithstanding any provision of the laws or constitution of any State or any provision of Federal law, except as provided in subsections (c), (e)(2) and (1) of this section, and in clause (iii) of this subparagraph, the Corporation, upon its determination that severe financial conditions exist which threaten the stability of a significant number of insured institutions, or of insured institutions possessing significant financial resources, may authorize, in its discretion and where it determines such authorization would lessen the risk to the Corporation, an insured institution that is eligible for assistance pursuant to section 1729(f) of this title to merge or consolidate with, or to transfer its assets and liabilities to, any other insured institution or any insured bank (as such term "insured bank" is defined in section 1813(h) of this title), may authorize any other insured institution to acquire control of said insured institution, or may authorize any company to acquire control of said insured institution or to acquire the assets or assume the liabilities thereof.

12 U.S.C. § 1730a(m)(1)(A)(i) (1987 Supp.)

are the American Road Insurance Company ("American Road"), which is a wholly owned subsidiary of Ford, and the Ford Life Insurance Company ("Ford Life"), which is wholly owned by American Road. Both of these companies are licensed to sell insurance in Pennsylvania and have been engaged in that business for over twenty years. Ford's simultaneous ownership of these insurance companies and FNB, however, placed it in violation of § 641 of the Pennsylvania insurance act.

Accordingly, in June 1987, three months after FNB's Pennsylvania branch office was opened, Ford filed a complaint in the United States district court for declaratory relief from Pennsylvania's enforcement of that statute which, Ford alleged, was unconstitutional on several grounds. Ford claimed, *inter alia* that, to the extent that the statute placed a restriction upon its ownership of a savings and loan institution, it was preempted by 12 U.S.C. § 1730a(m) (1987). Additionally, Ford contended that § 641 was constitutionally infirm because it was violative of the dormant commerce clause of the United States Constitution. The Insurance Commissioner of the State of Pennsylvania ("Insurance Commissioner" or "the Commissioner") filed a reply challenging the merits of the contentions raised by Ford. The Commissioner was joined by the appellants in this case, the Pennsylvania Association of Independent Insurance Agents ("Insurance Agents") who had successfully petitioned the district court for leave to intervene. Together with that motion to intervene, the Insurance Agents also filed a motion to dismiss Ford's complaint in which it petitioned the district court to abstain from adjudication of the complaint pursuant to the *Younger* doctrine of abstention.[3] Prior to intervening in the case, the Insurance Agents had

filed a complaint with the Insurance Commissioner initiating an administrative proceeding that sought the revocation of American Road's and Ford Life's insurance licenses because those companies were in violation of § 641. Subsequent to the insurance agents' intervention in this case, Ford filed a motion in the district court seeking an injunction of the state administrative proceedings.

Ford also filed a motion for summary judgement on three grounds: it contended that the statute was unconstitutional as a violation of the equal protection clause, that federal legislation preempted the entire field concerning the acquisition and ownership of savings and loans and that federal legislation that specifically addressed the acquisition of failing savings and loan institutions preempted § 641.

The district court concluded that neither of the first two contentions raised by Ford for summary judgement were meritorious. It concluded, however, that the language and legislative history of § 1730a(m) evinced Congress's clear intent to preempt state laws that hindered the acquisition of failing S & L's and determined, accordingly, that § 641 had been preempted. Because its decision rested on preemption grounds, the district court also held that abstention was improper. The insurance agents challenge each of the district court's conclusions on this appeal.[4]

### B. Foster v. United Services Automobile Ass'n ("USAA")

The United Services Automobile Association ("USAA") is a group of four Texas based insurance companies that are engaged in the insurance business nationwide. It is licensed to sell insurance in Pennsylvania and has been doing so for a

---

**3.** *See Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). That case represents the starting point for a judicial doctrine "designed to protect the institutional autonomy of state governments by limiting the power of federal courts to grant declaratory or injunctive relief against unconstitutional state action in circumstances where parallel state proceedings involving the federal litigants provide them with an adequate forum for airing their constitution-

al claims." L. Tribe, *American Constitutional Law* 201–02 (2d ed. 1988).

**4.** Ford does not cross-appeal from the decision of the district court concerning the alternate bases on which it sought summary judgment. Accordingly, none of these issues are before us on this appeal. Also, the Insurance Commissioner, although a named defendant, does not join as an appellant in this case.

number of years. In 1983, USAA was granted permission by the Federal Home Loan Bank Board and FSLIC to create the USAA Federal Savings Bank in Texas. In accordance with all applicable federal regulations, USAA organized and capitalized that bank, which then began doing business in Texas.[5] During the following year, the Pennsylvania Insurance Commissioner notified USAA that its simultaneous ownership of the Texas bank and continued sale of insurance policies in Pennsylvania, violated § 641. It advised USAA that pursuant to § 641, it must either cease the sale of insurance in Pennsylvania or divest itself entirely from ownership in the Texas bank. USAA filed a complaint in the district court seeking declaratory relief from enforcement of the statute, which it challenged as unconstitutional on its face and as preempted by federal regulation. Subsequent to that complaint, the insurance department commenced state administrative proceedings for the revocation of USAA's license to sell insurance in Pennsylvania and, in light of those proceedings, filed a motion for dismissal in the district court on abstention grounds. USAA cross-filed a motion for summary judgment on the grounds that § 641 was preempted by § 1730a.

The district court concluded that abstention was appropriate under each of three types of abstention: *Younger, Pullman*[6] and *Burford*.[7] We reversed that decision and held that abstention by the district court under any of these theory was improper. *See United Services Automobile Ass'n v. Muir,* 792 F.2d 356 (3d Cir.1986), *cert. denied, sub nom. Grode v. United Services Automobile Ass'n,* 479 U.S. 1031, 107 S.Ct. 875, 93 L.Ed.2d 830 (1987) (*"USAA I"*). Accordingly, we remanded this matter to the district court for hearing.

On remand, the Insurance Commissioner again petitioned the district court to abstain. The Commissioner limited this request to *Younger* abstention and contended that this Court's decision in *USAA I* had been overruled by intercedent precedent of the Supreme Court in the case *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (*"Dayton Schools"*). The Commissioner argued that *USAA I* had held that *Younger* abstention was inappropriate only because of this Court's view that the State administrative proceedings were an inadequate forum for the constitutional claims raised. The Commissioner argued that that conclusion was no longer valid in light of *Dayton Schools* and, accordingly, that abstention pursuant to *Younger* was appropriate.

The district court agreed that *USAA I* had been overruled by *Dayton Schools* regarding the issue of *Younger* abstention. It concluded, however, that because of the potential for irreparable harm to USAA, abstention was nonetheless improper. In light of that conclusion, the district court evaluated the merits of the constitutional claims presented. It concluded that USAA's claim that § 641 was preempted by § 1730a was without merit, but determined that § 641 was unconstitutional as a violation of the Commerce Clause.

On this appeal, the Insurance Commissioner and the Insurance Agents challenge the district court's decision not to abstain and its determination that § 641 is unconstitutional. USAA cross-appeals from the decision of the district court that enforcement of § 641 against it is not preempted by the federal regulatory scheme.

## II. *Abstention*

Although the analyses of the district courts regarding this issue arise from different circumstances, the threshold concern of both is whether abstention pursuant to *Younger* was warranted. That doctrine of abstention, characterized as one of equitable restraint, instructs us that due

---

**5.** The record does not indicate—and the insurance commissioner does not contend—that this bank has ever solicited deposits from Pennsylvania citizens, or otherwise done any business in Pennsylvania.

**6.** *See Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

**7.** *See Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

deference must be paid to state proceedings initiated to resolve controversies that raise significant state issues when federal court intervention is sought.[8] Deference to state proceedings pursuant to *Younger*, however, is not absolute. The appropriate focus of a court's inquiry when the question of *Younger* abstention is raised, therefore, is whether the state proceeding provides an adequate forum for the resolution of the federal claims that have been asserted, *see Dayton Schools*, 477 U.S. at 627, 106 S.Ct. at 2723 (*Younger* principle is applicable to "state administrative proceedings in which important state interests are vindicated, so long as in the course of those proceedings the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim");[9] and whether deference to the state proceeding will present a significant and immediate potential for irreparable harm to the federal interests asserted. *See Wooley v. Maynard*, 430 U.S. 705, 712, 97 S.Ct. 1428, 1434, 51 L.Ed.2d 752 (1977) (*Younger* abstention improper where federal intervention "necessary in order to afford adequate protection of constitutional rights"); *Kugler v. Helfant*, 421 U.S. 117, 124–25, 95 S.Ct. 1524, 1530–31, 44 L.Ed.2d 15 *reh'g denied*, 421 U.S. 1017, 95 S.Ct. 2425, 44 L.Ed.2d 686 (1975).

In the present cases, we are persuaded that Pennsylvania maintains the significant interest in the regulation of its insurance industry sufficient to support abstention under this doctrine. In light of the Supreme Court's decision in *Dayton Schools*, we are also persuaded that the scheme for administrative adjudication and judicial review of the claims presented is adequate for *Younger* purposes.

### A. Abstention And The Adequacy of State Administrative Proceedings

In *USAA I*, this Court held that "administrative proceedings suffice for *Younger* purposes only when they 'are adequate to vindicate federal claims.'" *USAA I*, 792 F.2d at 365. *See also Williams v. Red Bank Bd. of Education*, 662 F.2d 1008 (3d Cir.1981). In that light, we concluded that because the Insurance Commission proceeding did not provide a forum for the adjudication of the constitutional claims, abstention was inappropriate. *See Middlesex Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) (*Younger* abstention not available where there is no "adequate opportunity [in the state proceedings] to raise the constitutional claims.").

Subsequent to our decision in *USAA I*, the Supreme Court held that state administrative proceedings that do not provide an opportunity for the resolution of the claimant's constitutional contention, are adequate for *Younger* abstention if the state's judicial review of the administrative proceeding provides opportunity for *de novo* hearing of the constitutional claim. *Dayton Schools*, 477 U.S. at 629, 106 S.Ct. at 2724. *Cf. Watts v. Burkhart*, 854 F.2d 839

---

**8.** *Younger* abstention precludes intervention by federal courts into on-going state proceedings. The doctrine has been extended, however, to apply to circumstances in which the filing of a federal action *preceded* the initiation of the state proceedings. *See Hicks v. Miranda*, 422 U.S. 332, 349, 95 S.Ct. 2281, 2291, 45 L.Ed.2d 223 (1975) (federal court should abstain in favor of state proceeding initiated subsequent to federal action if no "proceedings of substance on the merits" in the federal action have occurred); *USAA I*, 792 F.2d at 365 ("[s]o long as 'the federal litigation was in an embryonic stage and no contested matter had been decided,' the district court may abstain under *Younger*") (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929, 95 S.Ct. 2561, 2566, 45 L.Ed.2d 648 (1975)). Thus, despite the fact that in both of these cases the federal declaratory action preceded the initi-

ation of the state proceedings, the inquiry into whether *Younger* abstention should apply was proper because no "proceedings of substance on the merits" had yet occurred in the federal courts.

**9.** This rule has been extended to include non-judicial state court proceedings that provide a full and fair opportunity for hearing of the federal claims. *See Dayton Schools*, 477 U.S. at 627, n. 2, 106 S.Ct. at 2723, n. 2; *Gibson v. Berryhill*, 411 U.S. 564, 576–77, 93 S.Ct. 1689, 1696–97, 36 L.Ed.2d 488 (1973) ("administrative proceedings looking toward the revocation of a license to practice medicine may in proper circumstances command the respect due court proceedings"); *Williams v. Red Bank Bd. of Education*, 662 F.2d 1008 (3d Cir.1981).

(6th Cir.1988) (the fact that the state agency would not consider the constitutional claims raised did not preclude *Younger* abstention where the constitutional claims could be presented on review in the state court); *Christ the King Regional High School v. Calvert,* 815 F.2d 219 (2d Cir.) (same), *cert. denied* — U.S. ——, 108 S.Ct. 102, 98 L.Ed.2d 63 (1987). Accordingly, we hold now that, to the extent that our decision in *USAA I* concluded that *Younger* abstention is inappropriate in cases where the administrative proceeding itself does not provide a forum for the adjudication of constitutional claims—without regard to the opportunity that exists to pursue those claims on judicial review—it has been overruled by *Dayton Schools.*

■ In the present cases, this conclusion necessarily results in the determination that the Pennsylvania administrative proceeding in question is sufficient for purposes of *Younger* abstention. The Pennsylvania statutes concerning administrative law and procedure clearly provide for adequate judicial review of state administrative determinations. The statute expressly provides that

> [a]ny person aggrieved by an adjudication of a Commonwealth agency who has a direct interest in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals ...

2 Pa. Cons.Stat.Ann. § 702 (Purdon 1988). Significantly, the statute provides further that

> [a] party who proceeded before a Commonwealth agency under the terms of a particular statute *shall not be precluded from questioning the validity of the statute in the appeal,* but such party may not raise upon appeal any other question not raised before the agency (notwithstanding the fact that the agency may not be competent to resolve such

question) unless allowed by the court upon due cause shown.

2 Pa. Cons.Stat.Ann. § 703(a) (Purdon 1988) (emphasis added). We read these provisions of the Pennsylvania law to permit the assertion of the unconstitutionality of a statute on judicial review of an administrative proceeding in which that statute has been applied and, in light of *Dayton Schools,* conclude that the administrative proceedings in this case are sufficient for application of *Younger* principles.

Our inquiry into the propriety of *Younger* abstention for the present cases, however, is not terminated here. The district courts in these cases relied on reasons apart from the adequacy of the state proceedings to support their decisions that *Younger* abstention was improper and, on one of these alternate grounds, we affirm their conclusions.

### B. Abstention and "Our Federalism"

In *Ford,* the district court's decision not to abstain was predicated upon its view that § 641 had been preempted by federal legislation enacted to provide for the acquisition of failing savings and loans. Relying upon this Court's decision in *Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Comm'n,* 791 F.2d 1111 (3d Cir.1986) (*"Kentucky West"*), the district court held that because the supremacy clause was implicated, abstention in favor of the state proceeding was improper. *See Ford Motor Co. v. Insurance Commissioner of Pennsylvania,* 672 F.Supp. 841, 849–50 (E.D.Pa.1987). The district court stated that "dispositive [of its decision] is a line of cases from the Courts of Appeals for the Third, Eighth, Ninth and Eleventh Circuits that hold that there can be no important state interest that the federal court should defer to in enforcing a state law that has been preempted by federal law." *Id.* at 849.[10]

---

10. We note that an alternative argument against abstention, which is not addressed by the district court, is raised in *Ford* concerning the fact that private individuals—and not the state—initiated the proceedings at issue. This Court has noted that the state's interests in adjudication of a controversy is entitled to less deference in the abstention inquiry where the proceeding was not begun by the state. *See Johnson v. Kelly,* 583 F.2d 1242, 1249 (3d Cir.1978) (abstention improper in a challenge of tax sales of property when state action to quiet title was brought by private citizens). This Court has also previously concluded that "where the pending state pro-

**934**

In this case, as in *Kentucky West,* we note that there is no absolute rule prohibiting the application of *Younger* abstention doctrine whenever the Supremacy Clause is invoked. *See Kentucky West,* 791 F.2d at 1117 ("[i]t would ... be an overstatement to suggest that *Younger* abstention is never appropriate when the question presented is one of preemption.") The presence of a claim of preemption in such cases, however, requires review of the state interest to be served by abstention, in tandem with the federal interest that is asserted to have usurped the state law. In performing that inquiry, this Court and other appellate courts have "concluded that the notion of 'comity' embodied by the *Younger* doctrine is 'not strained when a federal court cuts off state proceedings that entrench upon the federal domain.'" *Id.* (quoting *Middle South Energy, Inc. v. Arkansas Public Service Comm'n,* 772 F.2d 404, 417 (8th Cir.1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986)). *Cf. Champion Int'l Corp. v. Brown,* 731 F.2d 1406, 1409 (9th Cir.1984) ("Montana has no cognizable state interest in enforcing those age discrimination laws that are preempted by federal law"). In the present cases, we see no beneficial purpose, as contemplated by the *Younger* doctrine, that would be served by the district court's abstention in favor of Pennsylvania's enforcement of § 641. Although Pennsylvania's interest in the regulation of its insurance industry is significant, there exists a countervailing significant federal interest in insuring the unhindered enforce-ment of federal law. Balancing these interests in the present cases, we are persuaded that the scales weigh decidedly in favor of federal intervention so that the federal courts could determine the extent to which § 641 had been preempted.

As a preface to our holding on this issue, we note our view that the intent of § 641 is not ambiguous. That section was designed clearly to proscribe affiliations between all state licensed insurance companies and *any* savings and loans institutions. Accordingly, no detailed factual proceedings are necessary to determine the statute's applicability to Pennsylvania licensed insurance companies that purchase savings and loan institutions pursuant to § 1730a. *See Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971) ("[w]here there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim"); *cf. Aluminum Co. of America v. Utilities Comm'n of North Carolina,* 713 F.2d 1024, 1030 (4th Cir.1983) (abstention is inappropriate where conflict between challenged state action and federal law is "readily discernible from the pleadings") *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984). Moreover, on the records of these cases, we can discern no construction of the state statute that would limit its application such that review of the federal constitutional claims would be unnecessary.[11] "In cases involving a facial

---

ceeding is a privately initiated one, the state's interest in that proceeding is not strong enough to merit *Younger* abstention, for it is no greater than its interest in any other litigation that takes place in its courts." *Williams,* 662 F.2d at 1019. These decisions are intended to exclude cases that are initiated for the adjudication of essentially private controversies from the purview of *Younger* abstention. They are distinguishable from the present cases in which the *state's* interest in its proceeding is readily apparent. Despite their initiation by a private complainant, the proceedings at issue necessarily involve the Insurance Commissioner and are conducted by the state commission which enforces the insurance statute. Moreover, as we stated above, we recognize the state's significant interest in the regulation of its insurance industry, and we reiterate our conclusion in *Williams* that

"*Younger* commands respect for important state interests, not technicalities of form." *Id.*

11. USAA reasserts on this appeal its contention that it is not subject to the prohibitions of § 641, even if the constitutionality of that statute is upheld, because it's banking affiliate "neither accepts deposits nor lends money *in Pennsylvania* and[,] therefore[,] is not a 'lending institution' within the meaning of the statute." Appellee/Cross–Appellant (USAA) Brief at 19 (emphasis in original). The district court's decision on remand from *USAA I* does not address this contention and, on this record, it is not apparent that the appellee continued to pursue this claim in the district court. We cannot conclude that this issue, which requires factual inquiry as well as the interpretation and application of Pennsylvania state law, is properly before us.

challenge to a statute, the pivotal question in determining whether abstention is appropriate is whether the statute is 'fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question.'" *City of Houston, Texas v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 2513, 96 L.Ed.2d 398 (1987) (quoting *Harman v. Forssenius,* 380 U.S. 528, 534–35, 85 S.Ct. 1177, 1181–82, 14 L.Ed.2d 50 (1965)) (other citations omitted). When the possibility for such an interpretation is not apparent, however, the district court's decision to exercise its jurisdiction does not constitute error. Moreover, where the core of the controversy itself is the federal constitutional claims, and the state proceedings are initiated for *enforcement* rather than *interpretation* of the state statute, we do not conclude that the exercise of federal jurisdiction is intrusive.

 In our view, the principles of comity and federalism upon which the *Younger* doctrine is predicated, are not undermined by federal intervention in these cases,

which would forestall the state proceedings in order to determine whether enforcement of the state statute conflicts with an important federal scheme. *Cf. Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 1526, 95 L.Ed.2d 1 (1987) (*Younger* abstention warranted when "civil proceedings are pending, *if the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government.*") (emphasis added). Federal intervention in these cases does not intrude upon the principles of our federalism given the nature of the state proceedings at issue and the significance of the federal claims asserted. Accordingly, we conclude in both of the present cases, that the challenge to § 641 on the grounds that it is preempted, together with the significant federal interest that is implicated, counsel in favor of the district courts' decisions not to abstain.[12] We will, therefore, affirm the decisions of the district courts not to abstain.[13]

Accordingly, we do not reach this issue. We will remand this question to the district court, however, to determine the viability of this claim and, if viable, for initial decision on the merits.

12. Our conclusion that *Younger* abstention was not warranted in these circumstances applies to each case, despite our holding, that the preemption claim prevails only with regard to one of the transactions in one of the cases. *See infra.* § III. Our holding regarding *Younger* is predicated upon the significance of the federal interest invoked in these cases and our determination that the principles of comity and federalism are not undermined by the intervention of the federal court into the state proceedings in these cases. The determination of whether abstention is proper where preemption is alleged does not rest upon whether the preemption claim will ultimately prevail. Accordingly, just as the presence of a claim of preemption will not preclude abstention in every case, the decision that abstention is improper in light of a claim of preemption that has been asserted, need not result in the finding that the state statute has in fact been preempted.

13. Although we have concluded that the district court's decision not to abstain in *USAA* was appropriate, we are compelled to address the rationale upon which the district court relied. On remand from our decision in *USAA I* the district court recognized that *Dayton Schools* overruled our decision with regard to the adequacy of the Pennsylvania proceedings, *see*

*USAA v. Foster,* 680 F.Supp. 712, 175 (M.D.Pa. 1987). The district court declined to abstain, however, based on its interpretation of this Court's decision in *Sullivan v. City of Pittsburgh,* 811 F.2d 171 (3d Cir.) *cert. denied,* — U.S. —, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). The district court determined that in *Sullivan* this Court added a separate "irreparable harm" factor to the inquiry of when *Younger* abstention is proper. Accordingly, the district court concluded that prior to invoking *Younger* abstention it had to ascertain whether abstention would result in irreparable harm to USAA and, on that point, the district court held that it was bound by the decision of this Court in *USAA I* concerning the affect that abstention would have upon USAA. It held that "[i]n [*USAA I*], the Third Circuit decided that USAA would suffer irreparable harm if we were to abstain." *USAA,* 680 F.Supp. at 715.

The district court's interpretation of *Sullivan* was in error. *Sullivan* did not create a new criterion to be evaluated in the *Younger* analysis, but rather interpreted—in light of the specific circumstances of the case under review—a factor that has always been an appropriate part of that inquiry. In *Younger* and in its companion cases, the Supreme Court affirmed a long standing judicial policy that deference to a state action is improper where "extraordinary circumstances [exist] in which ... irreparable injury" to the litigant's ability to vindicate the constitutional claim is demonstrated. *Younger,* 401 U.S. at 55, 91 S.Ct. at 755. *See also, Samuels v.*

### III. *Preemption*

Both Ford and USAA contend that § 641 has been completely displaced by federal legislation and is therefore invalid under the Supremacy Clause of the Constitution. *See* U.S. Const. art VI, cl. 2.[14] They argue that Congress has preempted the field of regulation regarding savings and loan institutions and, thus, that § 641 has been superceded by the federal scheme. To the extent that § 641 applies to the acquisition of failing thrifts we are convinced that it has been preempted by federal law. We are unpersuaded, however, as were the district courts, that Congress intended to preempt entirely the states' authority to impose regulations upon savings and loan institutions that operate within the state's borders, or, as in the present case, to impose regulations upon other financial institutions that seek affiliations with savings and loans.

■ In reaching this conclusion, we are guided by the Supreme Court's instruction that preemption analysis should be "tempered by the conviction that the proper approach is to reconcile 'the operation of both statutory schemes with one another rather than holding one completely ousted.'" *Merrill Lynch v. Ware*, 414 U.S. 117, 127, 94 S.Ct. 383, 389, 38 L.Ed.2d 348 (1973). *Cf. Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 *reh. denied*, 374 U.S. 858, 83 S.Ct. 1861, 10 L.Ed.2d 1082 (1963) ("federal regulation of a field of commerce should not be deemed pre-emptive of state regulatory power in

*Mackell*, 401 U.S. 66, 69, 91 S.Ct. 764, 766, 27 L.Ed.2d 688 (1971) ("in the *Younger* case, we set out in detail the historical and practical basis for the settled doctrine of equity that a federal court should not enjoin a state criminal prosecution begun prior to the institution of the federal suit except in very unusual situations, where necessary to prevent immediate irreparable injury."). In *Sullivan*, we noted that "the nature of the term 'irreparable harm' makes it difficult to define every situation the term encompasses." *Sullivan*, 811 F.2d at 179 (citing *Trainor v. Hernandez*, 431 U.S. 434, 442 n. 7, 97 S.Ct. 1911, 1917 n. 7, 52 L.Ed.2d 486 (1977)). We also noted the Supreme Court's instruction that "circumstances are extraordinary in the relevant *Younger* sense where they create 'an extraordinarily pressing need for immediate federal equitable relief'" *Sullivan*, 811 F.2d at 179 (quoting *Kugler*, 421 U.S. at 124–25, 95 S.Ct. at 1530–31). *See also Wooley*, 430 U.S. at 712, 97 S.Ct. at 1434 (extraordinary circumstances, in terms of *Younger*, exist where "'an injunction is necessary in order to afford adequate protection of constitutional rights.'") (quoting *Spielman Motor Co. v. Dodge*, 295 U.S. 89, 95, 55 S.Ct. 678, 680, 79 L.Ed. 1322 (1935)). We reiterate here that this exception is intended to be applied with careful scrutiny and only to the extraordinary case.

In *Sullivan*, we concluded that extraordinary circumstances were present that warranted immediate federal court intervention. That case concerned recovering alcoholics who sought declaratory and injunctive relief—predicated upon claims of constitutional deprivation—from the city of Pittsburgh's decision to close alcoholic treatment centers. The district court had made a factual finding that "if recovering alcoholics at the Center were improperly forced from the center and into a community which cannot provide treatment for their abuse, these alcoholics"

might suffer severe injury or death as a result. *Sullivan*, 811 F.2d at 180. We determined that this factual finding was not in error and held that "the threat of this type of injury is precisely what the irreparable harm exception to *Younger* is intended to prevent." *Id.* Specifically, we noted that

[a] wrongful deprivation by the City of Pittsburgh in this case would threaten not only to do harm to appellees' present enjoyment of rights to Equal Protection, Due Process and equal treatment under the Rehabilitation Act of 1973, *but to eliminate the possibility of appellees' enjoyment or exercise of any federal constitutional or statutory rights in the future.*

*Id.* (emphasis added). In the present cases, on the records before us, we cannot say with certainty that the same potential for irreparable injury to the appellees' right to vindicate their federal claims exist, and thus that "extraordinary circumstances" are present that compel immediate federal intervention. Accordingly, we will not affirm the district court's rationale in *USAA* that irreparable harm mandated disregard for *Younger*. In light of our holding that abstention was nonetheless proper, however, we will uphold the district court's judgment.

14. In pertinent part, that provision states that the "Constitution, and the Laws of the United States which shall be made in Pursuant thereof ... shall be the supreme Law of the Land ..." U.S. Const. Art. VI cl. 2. *See also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824) ("to such acts of the State Legislatures as do not transcend their powers, but ... interfere with, or are contrary to the law of Congress, made in pursuance of the constitution, ... [i]n every such case, the act of Congress ... is supreme; and the law of the State ... must yield to it.")

the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakenly so ordained"). In light of this presumption in favor of the validity of state regulation, and because there is no clear indication that federal legislation is intended exclusively to provide for every aspect of the regulation of savings and loan institutions, we conclude that, apart from its application to savings and loan companies acquired pursuant to § 1730a(m), § 641's proscription of affiliations between insurance companies and savings and loan institutions has not been preempted.

### A. Section 641 is Pre-empted Regarding the Acquisition of Failing Thrifts

"The question [of] whether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme." *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); *California Savings and Loan Ass'n v. Guerra,* 479 U.S. 272, 281, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987) ("[i]n determining whether a state statute is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress.") Significantly, we note that Congress may decide not to displace state law entirely and, consequently, "may ... preempt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible." *Michigan Canners & Freezers Ass'n., Inc. v. Agricultural Marketing & Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984) (citing *Florida Lime & Avocado Growers v. Paul,* 373 U.S. at 142–43, 83 S.Ct. at 1217–18). A conflict arises also where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*

*v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *see also Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375.

In the present cases, we have no difficulty discerning Congress' intent from the language and legislative history of § 1730a(m) which, in our view, clearly provides that § 641 is preempted to the extent that it applies to Ford's acquisition of failing savings and loans.

■ In pertinent part, § 1730a(m) provides that "[n]otwithstanding any provision of the laws or constitutions of any State or any provision of Federal law ... [FSLIC] upon its determination that severe financial conditions exist which threaten the stability of a significant number of insured institutions ... may authorize *any company* to acquire control of said insured institution." 12 U.S.C. § 1730a(m) (Supp.1987) (emphasis added). This language amply demonstrates Congress' intent to preempt *all* other legislation that might inhibit the purchase of a failing thrift by a FSLIC approved buyer. Although that language, by itself, is sufficient to support our conclusion, Congress has left an even more explicit statement of its intent. In the conference report on the reenactment of 1730a(m), Congress expressly noted that with regard to the circumstances presented by one of these cases

[e]xcept as [limited by other sections of the federal statute] section 408(m)(A)(i) preempts other provisions of Federal and State law that would have the effect of preventing a company from acquiring a failing thrift institution. *Thus, for example if a life insurance company invested in or acquired a thrift institution under section 408(m) [enacted and codified as 1730a(m)], that section would preempt any state law that would prevent the company from continuing to engage in the life insurance business because of that investment or acquisition ...*

H.R.Rep. No. 261, 100th Cong., 1st Sess., Cong.Rec. H 6857, H 6895 (daily ed. July 31, 1987) (emphasis added), U.S.Code Cong. & Admin.News 1987, p. 489. This legisla-

tive history provides unmistakable guidance to us for the disposition of this issue. *See United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 134, 98 S.Ct. 965, 980, 55 L.Ed.2d 148 (1978) ("the legislative background of [a] reenactment is conclusive.... [w]hen a Congress that reenacts a statute voices its approval of an administrative or other interpretation thereof, Congress is treated as having adopted that interpretation and this Court is bound thereby"). We hold that Congress's intent to preclude any impediment to the acquisition of failing thrifts is clear. In the present cases, therefore, we conclude that § 641 is preempted with regard to Ford's purchase of the Ohio thrifts *and* the authorized branch offices of those thrifts opened in Colorado and Pennsylvania.

We reach the latter part of this holding in light of the factual finding by the district court that an essential aspect of Ford's agreement with FSLIC to purchase the Ohio thrifts was the authorization that Ford received to open the branch offices of the thrift. *Ford,* 672 F.Supp. at 843. Specifically, the district court found that, "under the authority of 12 U.S.C. § 1730a(m), the Bank Board granted to FNB the right to open branches in Pennsylvania and [Colorado]." *Id.* The district court took note of the Bank Board finding that

> "the Acquisition and Merger [of FNB and the Ohio thrifts] are of very substantial benefit to the FSLIC in a measure sufficient *to constitute a compelling factor in determining to make an award of branching rights in Pennsylvania and Colorado to [FNB]*"

*Id.* (quoting Bank Board resolution approving acquisition of Ohio thrifts) (emphasis added). The district court concluded that "FNB would not have acquired the Ohio savings and loan associations if it did not get the right to open branches in these two states in return." *Id.* We do not find that determination to be clearly erroneous. We are compelled by it, and the rationale underlying § 1730a(m), to preclude application of § 641 to the Pennsylvania or Colorado branches of the thrift. In our view, application of § 641 to these branches would frustrate the intent of the federal

legislation just as would the application of the state statute directly to the purchase of the Ohio thrifts themselves. Accordingly, § 641 is preempted as to these authorized branches as well as the Ohio thrifts and enforcement by Pennsylvania of § 641 as to Ford's ownership of these thrifts is precluded.

We do not reach a similar conclusion concerning thrifts acquired or capitalized outside of the purview of § 1730a(m). The legislative intent to preempt the application of § 641 beyond cases involving the acquisition of failing thrifts is not evident, and accordingly, as to those cases, § 641 has not been preempted.

B. Federal Regulations That Concern The Savings and Loan Industry, Although Comprehensive, Do Not Evidence Congress's Intent to Displace State Regulation Entirely and Do Not Pre-empt § 641

In these cases, USAA and Ford argue that the regulatory scheme that Congress enacted for the savings and loan industry was intended to occupy that field exclusively. They contend that the federal scheme was intended to regulate more than just the *operations* of savings and loan institutions, but also to regulate every aspect "regarding the organization, ownership, incorporation, and operation of federal savings banks." Appellee (*USAA*) Brief at 21. *See also,* Appellee (*Ford*) Brief at 24 ("[section] 641 is preempted as applied ... because it frustrates federal purposes and 'stands as an obstacle' to the broad and pervasive federal regulatory scheme governing the ownership and control of federal S & L's"). They assert that the comprehensiveness of the federal regulatory scheme, together with the significant federal interest in the regulation of savings and loan institutions, evinces congressional intent to preclude supplemental state regulation. We do not agree.

In cases such as these, where Congress has not expressly preempted a state's statute, its "intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is suffi-

ciently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough County*, 471 U.S. at 714, 105 S.Ct. at 2375. *See also Guerra*, 479 U.S. at 280, 107 S.Ct. at 689 (congressional intent to preempt may be inferred where the scheme of federal regulation is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplemental state regulation").

In both cases, the district courts acknowledged the comprehensiveness of the federal regulatory scheme. *See USAA*, 680 F.Supp. at 716; *Ford*, 672 F.Supp. at 846. Both district courts, however, concluded that the intent of the federal scheme was to regulate the *operation* of federally insured thrifts. Accordingly, each court concluded that the federal regulations did not preclude supplemental state regulations which, as in these cases, imposed a restriction upon the *affiliations* that the thrift could have and were designed more to regulate the insurance industry rather than to control the operation of the savings and loan industry. Our review of the federal regulatory scheme leads us to a similar conclusion.

We reiterate that our conclusion on this issue is informed by the Supreme Court's instruction that "federal regulation of a field of commerce should not be deemed pre-emptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakenly so ordained." *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. at 142, 83 S.Ct. at 1217. We are unconvinced that the federal banking regulatory scheme permits no conclusion other than that Congress intended to occupy the field exclusively.

Initially we note that the comprehensive nature of the federal regulatory scheme, by itself, is not sufficient to support a conclusion that Congress intended to preempt all state regulation. *See Hillsborough*, 471 U.S. at 717, 105 S.Ct. at 2377 ("[t]o infer preemption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive"). Indeed, precisely because the regulatory scheme at issue in these cases is so detailed, we interpret the absence of clear preemptive language as indicative that Congress did not intend to displace state law entirely. We note, as has the Supreme Court, that "because agencies normally address problems in a detailed manner and can speak through a variety of means ... we can expect that they will make their intentions clear if they intend for their regulations to be exclusive." *Id.*

Moreover, the regulations at issue in the present cases provide explicitly for preemption of state law on two issues, *see* 12 C.F.R. § 590 (1988) ("Preemption of State Lending Restrictions) (expressly preempting state usury laws and state due on sale laws), but no where indicate that *all* state regulation is preempted. Indeed, in one section, the regulations clearly demonstrate Congress' recognition that the federal scheme might be supplemented by state regulation. Section 555.17(b) precludes officers or directors of savings and loan associations from referring insurance business generated by members of the S & L to insurance companies with which the officers or directors are affiliated.[15] Such referrals would constitute a usurpation of the S & L's corporate opportunity to engage in the insurance business. Significantly, however, § 555.17 is limited by specific exceptions enumerated elsewhere in the section. One of those exceptions provides that

[n]o corporate opportunity for a Federal association to enter the insurance business is deemed to have existed

. . . .

*[w]hile a specific State statute or regulation precluded Federal association*

---

**15.** In pertinent part, that section provides that referral of insurance business of an association's members to an insurance agency owned by one or more officers or directors of the association, or by one or more persons having

the power to direct its management, constitutes usurpation of the association's corporate opportunity to engage in the insurance business.

12 C.F.R. § 555.17(b) (1988)

*service corporations ... from engaging in the insurance business*

12 C.F.R. § 555.17(c)(iii) (1988) (emphasis added).

Appellees correctly assert that the circumstance provided for in § 555.17 is not at issue in these cases. In our view, however, the existence of this provision provides compelling evidence that Congress did not envision that all state regulations would be in conflict with the federal regulatory scheme. Moreover, the subject matter of § 555.17(c)(iii) is particularly significant because it demonstrates Congress's specific awareness of the existence of state statutes such as § 641. In that light, we cannot conclude that, by these regulations, "Congress 'left no room' for supplementary state regulation." *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2373. Accordingly, we also cannot conclude that Congress intended exclusively to occupy this field of regulation.

### IV. *Dormant Commerce Clause*

Upon their conclusions that abstention was not warranted and that § 641 was not wholly preempted, the district courts reviewed Ford's and USAA's claim that § 641 was invalid as a violation of the dormant Commerce Clause. *See* U.S. Const. art. I., § 8, cl. 3.[16] On that claim, however, the courts concluded that to the extent that § 641 was not preempted, it was nonetheless constitutionally infirm because it imposed an excessive burden upon interstate commerce.

The courts determined that § 641's proscription of affiliations between Pennsylvania insurance companies and financial institutions—whether or not located in Pennsylvania—indirectly regulated interstate commerce. Accordingly, the district courts held that resolution of the constitutional validity of § 641 turned upon application of the Supreme Court's holding in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). In *Pike,* the Supreme Court stated that

[w]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be

---

**16.** In pertinent part, that clause provides that "Congress shall have Power ... [t]o regulate Commerce ... among the several states." U.S. Const. art. 1 § 8, cl. 3.

In light of its conclusion that USAA's creation of a Bank in Texas was not preempted by federal law because it did not fall within the scope of 1730a(m), the district court granted summary judgment to USAA on the grounds that enforcement of § 641 against that insurer violated the Commerce Clause.

In *Ford,* the district court initially did not reach the merits of this constitutional issue. It's decision held only that federal law preempted application of § 641 to the acquisition of the failing Ohio S & L's and the Pennsylvania and Colorado branches. Subsequent to that decision, the Commissioner moved for amendment of the district court's order because it did not address Ford's acquisition of FNFC and FNB in 1985, which the commissioner asserted was a violation of § 641. The Commissioner contended that application of § 641 was not preempted because those institutions had not been purchased pursuant to the failed S & L provision of federal law. In response to that motion the district court concluded that, although § 1730a did not preempt the application of § 641 to FNFC and FNB, "enforcement of section 641 on insurance companies that own banking affiliates that do not operate in Pennsylvania is

invalid as a violation of the commerce clause of the Constitution." *Ford Motor Co. v. Insurance Commissioner,* No. 87–3241 (Supplemental Memorandum) slip op. at 5, 1988 WL 29342 (E.D.Pa. Mar. 22, 1988) *reprinted at* Jt.App. at 148. (citing *USAA* ). In reaching its conclusion, the district court relied entirely upon the rationale expressed in *USAA v. Foster.* Accordingly, our discussion of the propriety of application of the Commerce Clause to § 641 focuses upon the decision issued in *USAA* and attributes that holding to both cases. We note, however, that the decision of the district court in *USAA* striking § 641 as violative of the Commerce Clause, relied in significant part upon the fact that the insurer in that case *did not own an affiliated bank that transacted business in Pennsylvania. See USAA,* 680 F.Supp. at 722. That circumstance, obviously, is not true in *Ford.* The decision in *USAA, in dicta,* did note that in cases that involved insurers who were affiliated with Pennsylvania banks "the concerns of the Commissioner and the [Independent Agents] become very real," *Id.* at 721–22, but summarily concluded that that statute would nonetheless be invalid as overbroad. In our view, that conclusion is insufficient of itself to support the judgement in *Ford.* For that reason, even if we were to sustain the decision of the district court in *USAA,* we could not, on this record, affirm the judgment of the district court in *Ford.*

upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits

*Id.* at 142, 90 S.Ct. at 847.

■■■ In the present cases, the district courts concluded in light of *Pike* that, although the imposition on interstate commerce that resulted from the enforcement of § 641 is incidental, that burden is still "excessive" because the benefits to Pennsylvania are not sufficiently realized by § 641 to support the burden upon interstate commerce. For that reason, the district courts struck § 641 as unconstitutional. In arriving at this balance between the significance of the state interest in precluding the affiliations between insurers and banking institutions, and the effect of that regulation upon interstate commerce, however, the district courts erred. Because that statute regulated indiscriminately—affording no preference to in-state interests over others—we cannot conclude that it presented a burden to *interstate* commerce and, in that light, we hold that it did not violate the Commerce Clause.

*Indiscriminate Regulation Of Commerce Does Not Necessarily Burden "Interstate Commerce"*

The Insurance Commissioner asserts that § 641 effects three important state goals: "to protect the insurance industry from ... unfair concentration; ... to protect consumers from coercive "tie-ins" and other forms of subtle pressure tactics by lending institutions; and ... to protect the ability of the insurance examiners to monitor adequately the insurance industry." *USAA,* 680 F.Supp. at 720. The district courts did not question the legitimacy of these goals, but concluded that "the adverse effects of affiliation are not present where the affiliated bank is outside the jurisdiction, or are readily prevented in ways less burdensome than is prescribed in Section 641(b)." *Id.*

Resolution of the issue of applicability of the Commerce Clause to these cases is dependent upon the level of scrutiny that is applied to review the Pennsylvania statute. As we have previously noted, three standards of review are applied in performing dormant Commerce Clause inquiry:

1) state actions that purposefully or arbitrarily discriminate against interstate commerce or undermine uniformity in areas of particular federal importance are given heightened scrutiny; 2) legislation in areas of peculiarly strong state interest is subject to very deferential review; and 3) the remaining cases are governed by a balancing rule, under which state law is invalid only if the incidental burden on interstate commerce is clearly excessive in relation to the putative local benefits.

*Norfolk Southern Corp. v. Oberly,* 822 F.2d 388, 398–99 (3d Cir.1987). Under the highest level of scrutiny "the burden falls upon the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 2448, 91 L.Ed.2d 110 (1986) (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979)). "In practice, such heightened scrutiny is applied with considerable rigor and turns out to be 'a virtually *per se* rule of invalidity.'" *Norfolk Southern Corp.,* 822 F.2d at 400 (quoting *Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978)).

In the present cases, heightened scrutiny of § 641 is not warranted because that provision does not discriminate in the manner that it regulates. As we have held "[h]eightened scrutiny is the standard of review for 'simple economic protectionism.' ... [this] category of protectionism includes those state measures that discriminate on their face against out-of-state interests or in favor of in-state interests." *Norfolk,* 822 F.2d at 400 (citing *Philadelphia,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Hughes; South–Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984)).

The state statute at issue, however, is not the "simple economic protectionism" that the Commerce Clause precludes. Accordingly, because heightened scrutiny is not applicable, § 641 must be upheld if the incidental burden that it imposes upon interstate commerce is not "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. *See also, Minnesota v. Clover Leaf Creamery, Co.*, 449 U.S. 456, 471, 101 S.Ct. 715, 727, 66 L.Ed.2d 659 *reh. denied*, 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981).[17]

As we have previously noted in performing that inquiry, "[t]he 'incidental burden on interstate commerce' appropriately considered in Commerce Clause balancing is the degree to which the state action incidentally discriminates against interstate commerce *relative to intrastate* commerce. It is a comparative measure." *Norfolk Southern*, 822 F.2d at 406 (emphasis added). In our view, "the Commerce Clause is concerned with protectionism and the need for uniformity ... legislation will not be invalidated under the *Pike* test in the absence of *discriminatory* burdens on interstate commerce." *Id.*

The Supreme Court's decision in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91, *reh. denied sub nom., Shell Oil Co. v. Governor of Maryland*, 439 U.S. 884, 99 S.Ct. 232, 58 L.Ed.2d 200 (1978), provides useful instruction. In *Exxon*, the Court addressed a Maryland statute that precluded companies that refined petroleum from owning retail service stations within Maryland. The proscription applied to in-state owners of oil refineries as well as to out of state refineries, and because no competitive advantage to local interest was discernible, the court upheld the constitutionality of the statute. In reaching its conclusion, the Court noted that the state act "create[d] no barriers whatsoever against interstate independent dealers; it [did] not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market." *Exxon*, 437 U.S. at 126, 98 S.Ct. at 2214. The Court concluded that "the absence of any of these factors *fully distinguishes this case from those in which a State has been found to have discriminated against interstate commerce.*" *Id.* (emphasis added). It held that

> [w]hile the refiners will no longer enjoy their same status in the Maryland market, in-state independent dealers will have no competitive advantage over out-of-state dealers. *The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce.*

437 U.S. at 126, 98 S.Ct. at 2214 (emphasis added). *See also CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 88, 107 S.Ct. 1637, 1649, 95 L.Ed.2d 67 (1987) ("[b]ecause nothing in the Indiana Act imposes a greater burden on out-of-state [entities] than it does on similarly situated Indiana [entities], we reject the contention that the Act discriminates against interstate commerce").

> This Court has similarly concluded that [w]here the "burden" on out-of-state interests is no different from that placed on competing in-state interests ... it is a burden on *commerce* rather than a burden on *interstate commerce*. In such cases, nothing in Commerce Clause jurisprudence entitles out-of state interests to more strict judicial review than that to which the in-state interests are entitled

*Norfolk Southern*, 822 F.2d at 406 (emphasis in original). We are persuaded that this same conclusion is applicable to the present cases. Section 641 places no discriminatory burdens on interstate insurers. It does not add increased costs to them or otherwise distinguish between in-state insurers

---

17. We do not reach the inquiry of whether § 641 is entitled to the second standard of review set forth in *Norfolk Southern*. Although Pennsylvania has a significant interest in the regulation of its insurance industry, its concern is not "pecularily local" such that it invokes this most differential standard of review.

and out-of-state insurers in the insurance market. Indeed, as the district court in *USAA* found, USAA "could not make ... [the] argument [that § 641 discriminates against interstate commerce in favor of local business] because Section 641(b) treats all insurance companies and all savings and loans alike, *whether or not they are based in Pennsylvania.*" *See USAA,* 680 F.Supp. at 719 n. 6. For these reasons, we conclude that the Commerce Clause has not been violated.[18]

The district courts, in reaching the conclusions that the Commerce Clause invalidates § 641, appear to have been most persuaded by the significant economic effect that enforcement of § 641 will have upon Ford and USAA. Indeed, the district court in *USAA* concluded that "[i]f the Insurance Department enforces Section 641(b) against USAA, USAA will be forced to abandon its insurance business in Pennsylvania or relinquish its interest in the Texas bank. If

USAA opts to allow its insurance license to be revoked, this revocation could result in devastating economic consequences." *USAA,* 680 F.Supp. at 721. On this point, the district court quoted this Court's opinion in *USAA I* in which we concluded, in our holding that *Pullman* abstention was inappropriate, that USAA would suffer "devastating economic consequences" if its license to sell insurance in Pennsylvania was revoked. *See id.* (quoting *USAA I,* 792 F.2d at 363).

We are not unaware, nor are we insensitive to this "burden" that results from the enforcement of the state provision. We cannot say, however, that the dormant Commerce Clause is the proper remedy. Both Ford and USAA appear to have adopted corporate strategies that seek to expand their corporate bases by the acquisition of other companies. That strategy is their own choosing and we express no value judgments concerning it. In making

---

**18.** Our holding in these cases is consonant with the Supreme Court's guidance in this area. The Court has previously noted that where regulations "affect alike shippers in interstate and intrastate commerce in large numbers within as well as without[,] the state is a safeguard against their abuse." *South Carolina State Highway Dep't v. Barnwell Bros.,* 303 U.S. 177, 187, 58 S.Ct. 510, 515, 82 L.Ed. 734 (1938). That holding endorses the rationale that the state's regulatory scheme will be adequately monitored because an instate constituency is similarly affected, and will act in its interests to keep the legislature from overreaching. *See also, Southern Pacific Co. v. Arizona,* 325 U.S. 761, 783, 65 S.Ct. 1515, 1527, 89 L.Ed. 1915 (1945); L. Tribe, *American Constitutional Law* at 409–10 & nn. 4–8 (2d ed. 1988).

One possible source of this rationale is the famous "footnote 4" of *Carolene Products. See United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938). Consistent with the overall view of that case, the court articulated a view that one commentator has described in the following manner:

[w]hen states adopt economic regulations that affect out-of-state interests, those out-of-state interests are likely to be shortchanged because they are not represented in the political process that produces the regulations. But everyone who is affected ought to be represented. Therefore we have judicial review of state economic regulation that affects out-of-state interests in order to give those interests "virtual representation."

Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause,* 84 Mich.L.Rev. 1091, 1160 (1986). The value of this analytical approach is debated. *Compare id.* (asserting that implicit in such an approach is the reliance upon balancing state and federal interests, and arguing that such an approach should be replaced by inquiry of the state legislature's motivation) *with* Tushnet, *Rethinking the Dormant Commerce Clause,* 79 Wis.L.Rev. 125 (1979) (discussing a political theory of judicial review in dormant commerce clause cases in which the focus of concern is the adequacy of the legislature to protect important interests). This rationale however, is firmly entrenched in our jurisprudence, *see, e.g., Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 473 n. 17, 101 S.Ct. 715, 728 n. 17, 66 L.Ed.2d 659 *reh. denied,* 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981) ("[t]he existence of major in-state interests adversely affected by the [state statute] is a powerful safeguard against legislative abuse); *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 444 n. 18, 98 S.Ct. 787, 795 n. 18, 54 L.Ed.2d 664 (1978) ("[t]he Court's special deference to state highway regulations derives in part from the assumption that where such regulations do not discriminate on their face against interstate commerce, their burden usually falls on local economic interests as well as other states' economic interests, thus insuring that a state's own political processes will serve as a check against unduly burdensome regulations"), and persuades us in the present cases, that the protections afforded by the Commerce Clause are not implicated.

those choices, however, the companies must expect that they will be required to comply with all applicable state as well as federal regulations. They cannot hope to invoke the Constitution at every turn to circumvent state regulation and insure unrestricted expansion and protection of their opportunity to obtain the greatest margin of profit.

On this point we are again guided by *Exxon*. In that case, the Supreme Court noted arguments that, as the result of the state divestiture regulation, some oil refiners would stop selling in Maryland. *See Exxon*, 437 U.S. at 127, 98 S.Ct. at 2215. The Court also recognized that the result of that occurrence might be that Maryland consumers would be deprived of some special services that had previously been provided by the affiliated retail stations. *Id.* Although it assumed, *arguendo*, the accuracy of these contentions, the Court nonetheless concluded that the protections of the Commerce Clause had not been triggered. Significantly, it concluded that even if those refiners chose to withdraw entirely from the Maryland market "there [was] no reason to assume that their share of the entire supply [would] not be promptly replaced by other *interstate* refiners.... interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Exxon*, 437 U.S. at 127, 98 S.Ct. at 2215. Similarly, in the present cases, the district courts, holdings give us no reason to conclude that *interstate commerce* will be adversely affected by enforcement of § 641. There is no reason for us to assume that USAA's or Ford's share of the insurance products sold in Pennsylvania will not be promptly replaced by other interstate insurers. Accordingly, we cannot conclude that § 641 places an impermissible burden upon interstate commerce.

The district courts distinguish *Exxon* on the grounds that the statute at issue in that case "did not have the practical effect of indirectly regulating the refiners' ownership of other entities outside the state." *USAA*, 680 F.Supp. at 722. In that light, the courts concluded that "unlike [§ 641], the Maryland statute in the *Exxon* case did not reach beyond the borders of the state," *id.* and, because § 641 precluded Pennsylvania insurers from affiliations with S & L's wherever located, its affect upon interstate commerce was different from that involved in *Exxon*. We believe that this narrow reading of *Exxon* is in error.

We do not view the Court's decision in *Exxon* as predicated upon the conclusion that the state statute did not regulate beyond the Maryland borders. Indeed, we note that Justice Blackmun's dissent departs from the Court majority precisely because of the recognition that the Maryland statute had the actual effect of precluding many out-of-state businesses from participating in the retail market in Maryland. *See Exxon*, 437 U.S. at 138, 98 S.Ct. at 2220 ("[o]f the class of enterprises excluded entirely from participation in the retail gasoline market, 95% were out-of-state firms.") (Blackmun, J., concurring and dissenting). In our view, the focus of the majority opinion was the *manner* by which the statute regulated. The Court concluded that the fact that the statute regulated *indiscriminately* compelled the conclusion that the Commerce Clause had not been violated.[19]

As the Supreme Court has noted, "[t]he Commerce Clause [does not] protect[ ] the particular structure or method of operation in a retail market.... *the Clause protects the interstate market, not the particular interstate firms, from prohibitive or burdensome regulations.*" *Exxon*, 437 U.S. at 127, 98 S.Ct. at 2215 (emphasis added) (citation omitted). Thus, although § 641

**19.** We are not unaware that, even a statute that is facially indiscriminate may nonetheless be determined to be violative of the Commerce Clause because it has a discriminatory effect. Nothing in the records of the present cases, or in the decisions of the district courts, however, indicates that enforcement of § 641 will have the effect of favoring in-state interests over out-of-state interests.

may provide somewhat of a boon to independent insurance agents who sell insurance in Pennsylvania, that boon is no less available to independent agents who are based outside of the state as it is to such agents for whom Pennsylvania is home. To the extent that the regulation infringes upon the commercial association rights of lending institutions outside of Pennsylvania, it infringes upon those same rights of lending institutions within Pennsylvania. In that light, even if § 641 is viewed as "protectionist" of the economic interests of unaffiliated insurers, because it does not afford that protection only to local agents, it is not violative of the Commerce Clause.[20]

## V. *Conclusion*

In light of the foregoing, we reach the following conclusions in these cases: In *Ford*, we will affirm the decision of the district court not to abstain. We will also affirm the district court's decision that § 641 was inapplicable to Ford's acquisition of the two failing Ohio S & L's under the provisions of 12 U.S.C. § 1730a(m) (1982), and the branches authorized in connection with that acquisition, because the state statute has been preempted by the federal law concerning the emergency acquisition of failing thrifts. We will also affirm the district court's conclusion that § 641 is not preempted by federal law in its application to circumstances other than those provided by § 1730a(m). We will reverse, however, the district court's judgment that § 641 is violative of the dormant Commerce Clause.

In *USAA*, we will affirm the decision of the district court not to abstain, although we will not affirm the rationale upon which it relied. We will also affirm the holding of the district court that § 641 is not preempted by federal law in its application to USAA's establishment of a Texas savings and loan company. We will reverse, however, the district court's judgment that § 641 is violative of the dormant commerce clause and we will remand this matter to the district court for its determination of the viability of USAA's claim that the state statute is otherwise inapplicable to it. *See supra,* n. 11.

All parties in these cases will bear their own costs.

---

**20.** Finally, USAA and Ford argue that heightened scrutiny of § 641 is proper because of the significant need for uniformity in the regulation in this area. Their argument on this point appears, essentially, to be that the prohibition of a "financially sound" institution from eligibility to be a purchaser of a S & L conflicts with the federal policy. They argue that, pursuant to *Southern Pacific,* the Commerce Clause should render the statute unconstitutional because the "federal government has a compelling interest 'in the uniformity of regulation' in connection with the ownership, acquisition and control of federally insured thrift institutions." Appellee (Ford) Brief at 30 (quoting *Southern Pacific,* 325 U.S. at 770, 65 S.Ct. at 1521). To succeed on this argument, however, the appellees must demonstrate the presence of a national scheme to regulate completely the transfer and affiliations of every S & L throughout the country. They have failed in that demonstration and nei-

ther is the existence of such a scheme apparent on the face of the federal legislation.

In our view, the appellees' assertions on this point are merely the preemption argument dressed in different clothing. *See Rice,* 331 U.S. at 230, 67 S.Ct. at 1152 (federal preemption will be inferred where the field is one in which the federal interest is so dominant that the "federal system will be assumed to preclude enforcement of state laws on the same subject"), *see also, Hillsborough County,* 471 U.S. at 713, 2374. As we have held in this opinion *supra,* to the extent that § 641 imposes restrictions or regulations that affect the ability of an otherwise viable institution to purchase a *failing* thrift, it conflicts with federal legislation, and, therefore, is preempted. Apart from that circumstance, however, we do not discern a conflict between *the state statute and federal regulation of the savings and loan industry that requires invalidation of the state statute.